IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL A. HAYWOOD,** | ) | CIVIL ACTION NO. 11-1200 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **THE UNIVERSITY OF PITTSBURGH,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION

**CONTI, Chief District Judge**

### I.     *Introduction*

Pending before the court is a motion for summary judgment (ECF No. 57) filed by defendant and counterclaim plaintiff The University of Pittsburgh ("University") and a partial motion for summary judgment (ECF No. 60) filed by plaintiff and counterclaim defendant Michael Haywood ("Haywood").

Haywood initiated this diversity action on September 19, 2011, by filing a three-count complaint alleging: (1) a Pennsylvania state common law claim for breach of contract with respect to an employment contract (count A); (2) a Pennsylvania state common law claim for breach of contract with respect to an oral agreement (count B); and (3) a deprivation of Haywood's due process rights under the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983 (count C). (Haywood's Complaint ("complaint") (ECF No. 1.))

## II. Procedural Background

On October 14, 2011, the University filed with the court its answer, affirmative defenses, and counterclaim alleging breach of confidentiality of an employment contract ("counterclaim"). (ECF No. 10.) On the same day, the University filed a partial motion to dismiss count C of the complaint (ECF No. 8) and a brief in support of its motion. (ECF No. 9) On November 4, 2011, Haywood filed a response in opposition to the University's motion to dismiss. (ECF No. 14.) On February 1, 2012, Haywood filed an answer to the University's counterclaim. (ECF No. 20.) On February 22, 2012, the court granted the University's partial motion to dismiss with respect to count C, i.e., Haywood's claim that the University deprived him of his constitutional rights. (ECF No. 24.)

On February 14, 2013, the University filed a cross-motion for summary judgment, a brief in support of that motion, a concise statement of material facts, and an accompanying appendix with respect to all remaining claims, i.e., count A, count B, and the counterclaim. (ECF Nos. 57, 58, 59.) On March 18, 2013, Haywood filed a brief in opposition, and the University filed its reply. (ECF Nos. 68, 71.) On April 9, 2013, the parties filed a combined concise statement of material facts. (Combined Concise Statement of Material Fact ("C.S.F.") (ECF No. 72).)

On February 14, 2013, Haywood filed a cross-motion for summary judgment with respect to the University's counterclaim, a brief in support of his motion, a concise statement of material facts, and an accompanying appendix. (ECF Nos. 60, 61, 62, 63.) On March 18, 2013, the University filed a brief in opposition to Haywood's motion for summary judgment. (ECF No. 65.) On April 12, 2013, the parties filed a combined concise statement of material facts. (ECF No. 74.) The parties' motions for summary judgment having been fully briefed are now ripe to be decided by the court.

### III.    Factual Background

The factual background is derived from the undisputed evidence of record and the disputed evidence of record is viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### A.    The Parties

Haywood is an individual who formerly worked as a college football coach. (C.S.F. ¶ 1 (ECF No. 72); ECF No. 59-2.) The University is an institution of higher learning, and "an instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth System of Higher Education." (C.S.F. ¶ 2 (ECF No. 72); 24 PA. CONS. STAT. § 2510-202.)

### B.    Haywood's Employment Contract with the University

#### 1.    The Written Agreement

In early December 2010, Steve Pederson ("Pederson"), athletic director for the University, recruited Haywood to serve as the University's head football coach. (Deposition of Steve Pederson ("Pederson's Dep.") at 5-6, 14-15 (ECF No. 59-3 at 118-121).) Jerome Cochran ("Cochran"), executive vice chancellor and general counsel for the University, negotiated the terms of the employment contract for the University. (C.S.F. ¶ at 13(ECF No. 72); Pederson's Dep. at 19 (ECF No. 59-3 at 122); Deposition of Jerome Cochran ("Cochran's Dep.") at 78 (ECF 59-3 at 73).) Albert Elias ("Elias"), Haywood's attorney and agent, negotiated the terms of the employment contract for Haywood. (C.S.F. at ¶ 13 (ECF No. 72); Deposition of Albert Elias ("Elias' Dep.") at 20-21, 24-28, 56-59, 139 (ECF No. 70-1 at 91-93, 100-101, 121); Deposition of Mike Haywood ("Haywood's Dep.") at 60 (ECF No. 59-2 at 107).)

Haywood directly communicated with the University about the terms of the employment contract, did not have questions for Elias concerning terms of the employment contract, and only sought changes relating to the assistant coaches' compensation and salary pool. (Haywood's Dep. at 63-64, 69 (ECF No. 59-2 at 109-110, 113).) Haywood read and discussed the employment contract's compensation provisions with Elias, but did not read the non-economic terms of the employment contract. (Haywood's Dep. at 67-69, 71-72 (ECF No. 59-2 at 111-113, 114-115).) On December 16, 2010, Haywood entered into the employment contract with the University agreeing to serve as the University's head football coach. (C.S.F. ¶ 3 (ECF No. 74 at); Employment Contract (ECF No. 14-1).) The employment contract was to expire on January 15, 2016, unless otherwise extended or terminated. (Employment Contract ¶ 2.1 (ECF No. 14-1).)

Elias advises his clients to read the contracts they sign, but Haywood had not read the employment contract in its entirety as of August 29, 2012. (Elias' Dep. at 60 (ECF No. 70-1 at 101); Haywood's Dep. at 72 (ECF No. 59-2 at 115).) The employment contract provided Haywood a base salary of one million dollars per year, a vehicle, a private stadium box for home games, and supplemental compensation for exceptional performance. (Employment Contract ¶ 3 (ECF No. 14-1).) The employment contract provided: "All such annual base salary shall be paid to the employee in equal monthly installments, on the last day of each calendar month." (Employment Contract ¶ 3.1 (ECF No. 14-1).)

Under the terms of the employment contract, the University could terminate Haywood's employment with or without just cause. (Employment Contract ¶¶ 14.1, 14.2 (ECF No. 14-1); C.S.F. ¶19 (ECF No. 72 at 115).) If the University wanted to terminate the employment contract

without just cause, it had to provide Haywood written notification of such termination pursuant to paragraph 14.2 of the employment contract. Paragraph 14.2 provided:

> In addition to its rights as described in provision 14.1, the University shall have the right to unilateral termination of this Contract without just cause. Such unilateral termination by the University without just cause shall be effectuated by delivering to Employee written notice of the University's intent so to terminate this Contract. If, but only if, the University exercises its right to unilateral termination under this provision 14.2, Employee shall be entitled to liquidated damages in, and only in, the amount of Seven Hundred Fifty Thousand Dollars ($750,000) per Contract Year, pro rated, for the then-unexpired Term of this Contract, and such payment obligation shall survive the said termination of this Contract.

(Employment Contract ¶ 14.2 (ECF No. 14-1).) If the University terminated the employment contract with just cause, the University would be "relieved of all further obligations (financial and otherwise) to [Haywood]." (Employment Contract ¶ 14.1 (ECF No. 14-1); C.S.F. ¶ 20 (ECF No. 72).) The University could determine that just cause existed to terminate the employment contract if Haywood engaged in conduct

> that is seriously prejudicial to the best interests of the University or its intercollegiate athletics programs; that violates the University's or the Department's then-current mission; that brings the University into disrepute; or that reflects dishonesty, disloyalty, willful misconduct, gross negligence, moral turpitude or refusal or unwillingness to perform his duties…

(Employment Contract ¶ 14.1 (F) (ECF No. 14-1); C.S.F ¶ 21 (ECF No. 72).) If the University terminated the employment contract without just cause, Haywood would

> be entitled to liquidated damages in, and only in, the amount of Seven Hundred Fifty Thousand Dollars ($750,000) per Contract Year, pro rated, for the then-unexpired Term of this Contract, and such payment obligation shall survive the said termination of this Contract.

(Employment Contract ¶ 14.2 (ECF No. 14-1).) With respect to termination of the employment contract, paragraph 14.10 provided:

> Immediately upon expiration or any other termination of this Contract, as described herein, all obligations of the University to make payments to the

Employee or to provide consideration hereunder, except as and to the extent expressly described in provisions 14.2, 14.3, 14.4, 14.7, and 14.8, as and if applicable, shall cease as of the date of such expiration or termination. In no case shall the University be liable to the Employee for the loss of any collateral business opportunities or any other benefits, perquisites or income.

(Id. at ¶ 14.10.)

Elias does not remember discussing with Haywood any provisions of paragraph 14 of the employment contract, which governed termination of the employment contract. (C.S.F. ¶ 25 (ECF No. 72); Elias' Dep. at 61 (ECF No. 70-1 at 102).)

With respect to confidentiality, paragraph 17.1 of the employment contract provided:

The Employee and the University shall keep this Contract confidential, and shall not use any information contained herein for any purpose other than the purposes contemplated under this Contract. Each party acknowledges the importance of maintaining the security and confidentiality of this Contract and agrees to take whatever measures are necessary to prevent the unauthorized or inadvertent transfer, disclosure, access or use of the information contained herein to or by any third party. Each party hereto agrees to ensure that the terms and conditions of this Contract are adhered to by all persons who have access to the information contained herein through such party, including employees, advisors, representatives, and agents, and shall be responsible for breaches of confidentiality by its/his own employees, advisors, representatives, agents, and other persons who gain access to any such information through such recipient party. The information contained herein shall be disclosed only to those persons who are actively and directly participating in the performance of this Contract and who need to know such information, and each party shall use best efforts to inform the receiving party of the sensitive nature of such information and shall direct the receiving party to keep such information confidential.

(Employment Contract ¶ 17.1 (ECF No. 14-1); C.S.F. ¶ 26 (ECF No. 72).) Pursuant to this paragraph, the parties' confidentiality obligations survive the termination of the employment contract, money damages are an inadequate remedy, and the nonbreaching party has a right to seek "injunctive or other relief as it may deem appropriate." (Employment Contract ¶ 17.1 (ECF No. 14-1); C.S.F. ¶ 27 (ECF No. 72).)

Paragraph 24.1 of the employment contract provided:

> This Contract constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all previous and contemporaneous negotiations, commitments and understandings, whether verbal or written. This Contract shall not be released, discharged, amended or modified in any manner, except by an instrument in writing signed by both of the parties.

(Employment Contract ¶ 24.1 (ECF No. 14-1); C.S.F ¶ 28 (ECF No. 72).)

## 2. The Oral Agreement

Haywood wanted a provision in the employment contract whereby the University would buyout his remaining contract with Miami University. (Haywood's Dep. at 61 (ECF No. 59-2 at 108).) Elias spoke with Cochran with respect to a Miami University buyout clause, and Haywood would not sign the employment contract with the University unless a buyout clause was included in the employment contract. (Elias' Dep. at 45-47 (ECF No. 70-1 at 98).) Elias stated Cochran told him "he was not going to put it in there but he assured [Elias] that it would get paid out, that [Elias] could trust him on his word." (Elias' Dep. at 47 (ECF No. 70-1 at 98).) Cochran did not tell Elias why he would not include a buy-out clause in the Employment contract. (Elias' Dep. at 47-48 (ECF No. 70-1 at 98).) Pederson stated the University orally promised to buy-out Haywood's employment contract with Miami University, but that it did not happen because Haywood's employment "was terminated before we ever got to that point." (Pederson's Dep. at 20 (ECF No. 70-1 at 20).)

Elias stated it would be consistent with common practice for the University to buyout Haywood's existing contract with Miami University, and if a university agreed to such a condition, the employment contract would contain a provision explaining the terms of the buyout agreement. (Elias' Dep. at 45 (ECF No. 70-1 at 98).)

After Haywood's termination the University has "refused responsibility to buy [the Miami University contract] out." (Elias Dep. at 56 (ECF No. 70-1 at 100).) In February 2011

Miami University sent Haywood a letter demanding he personally pay the $300,000 buyout. (Elias' Dep. at 56 (ECF No. 70-1 at 100); Haywood's Dep. at 247-48 (ECF No. 70-1 at 65).) Haywood did not have contact with Miami University regarding the buyout clause after February 2011, but testified that Miami University had discussed the buyout with Elias in 2012. (Id.)

### C.    The Events of the Domestic Incident Between Haywood and Marriot

#### 1.    The Evening of December 30, 2010

On December 30, 2010, Haywood attempted to visit his two-year-old son at a residence Haywood owned in South Bend, Indiana ("residence") where his son and son's mother, Beth Marriott ("Marriott"), were staying. (Haywood 's Dep. at 131-133 (ECF No. 70-1 at 36-37).) Haywood testified Marriott did not let him into the house because Marriott was upset with Haywood. (Haywood's Dep. at 133 (ECF No. 59-2 at 119); C.S.F. ¶ 30 (ECF No. 72).) After circling the residence on foot, knocking on the doors and windows, Haywood left the residence and stayed at a hotel. (Haywood's Dep. at 132 (ECF No. 70-1 at 36).)

#### 2.    The Morning of December 31, 2010

On December 31, 2010, between 9:30 a.m. and 10:00 a.m., Haywood returned to the residence. (Haywood's Dep. at 133 (ECF No. 59-2 at 119); C.S.F. ¶ 31 (ECF No. 72).) Haywood testified he knew "without a doubt" that Marriott was mad at him when he returned to the house. (Haywood's Dep. at 134 (ECF No. 59-2 at 120); C.S.F. ¶ 31 (ECF No. 72).) Haywood circled the residence on foot again, knocking on the doors and windows. (Haywood's Dep. at 135 (ECF No. 70-1 at 37).) Haywood testified he did not know if Marriott and his son were in the residence. (Haywood's Dep. at 134 (ECF No. 59-2 at 120).) When no one answered the door at the residence, Haywood called his realtor, Jackie Rockie ("Rockie"). (Haywood's Dep. at 136

(ECF No. 70-1 at 37).) Haywood drove twenty minutes to meet Rockie in order to obtain a key to the residence. (Haywood's Dep. at 136 (ECF No. 70-1 at 37).)

### 3. The Afternoon of December 31, 2010

Haywood returned to the residence with the key and attempted to open the front door. (Haywood's Dep. at 137-138 (ECF No. 70-1 at 38).) Haywood testified that when he put the key in the door, the lock turned but he could not open the door. (Haywood's Dep. at 137-138 (ECF No. 70-1 at 38).) Haywood circled the residence on foot again, knocking on the doors and windows. (Haywood's Dep. at 138 (ECF No. 70-1 at 38).) Haywood looked through a window and "notice[d] that there [was] a white pole up against the door, so [he] put the key in and leaned up against the door and the pole slid out." (Haywood's Dep. at 138 (ECF No. 70-1 at 38).) Haywood opened the door and walked into the residence. (Haywood's Dep. at 138 (ECF No. 70-1 at 38).) Haywood was surprised, but not angry, that the door was barricaded. (Haywood's Dep. at 140 (ECF No. 59-2 at 121).)

Haywood audio recorded portions of the events that took place inside the residence. (Haywood's Dep. at 139-144 (ECF No. 70-1 at 38-39).) Haywood testified to the following matters:

- Haywood told Marriott she had blocked the door and barricaded it, but Marriott denied doing so. (Haywood's Dep. at 142 (ECF No. 59-2 at 123).)

- Marriot was "screaming and yelling" and "totally out of control" when Haywood entered the residence. (Haywood's Dep. at 146 (ECF No. 59-2 at 124).)

- Haywood noticed an empty wine bottle on the counter with an empty wine glass next to it. (Haywood's Dep. at 148 (ECF No. 59-2 at 125).)

- Haywood went into the living room in order to let Marriott "cool off." (Haywood's Dep. at 147-148 (ECF No. 70-1 at 40).)

- Haywood learned Marriot placed their son in a vehicle located in the garage attached to the residence and Marriott intended on leaving the residence with their son. (Haywood's Dep. at 149-150 (ECF No. 70-1 at 41).)

- Haywood followed Marriot down the stairs into the basement in order to access the garage to get his son out of the vehicle because he was concerned about leaving a child in a vehicle running with the garage door shut. (Haywood's Dep. at 149-151 (ECF No. 70-1 at 41).)

- Haywood turned off the audio recording before entering the garage. (Haywood's Dep. at 152 (ECF No. 70-1 at 41).)

- Once in the garage, Haywood told Marriott she could not drive the vehicle. (Haywood's Dep. at 151 (ECF No. 70-1 at 41).)

- Marriott pushed Haywood. (Haywood's Dep. at 151 (ECF No. 70-1 at 41).)

- Marriott opened the driver's side door to get into the vehicle. Haywood pushed the unlock button on the door's interior in order to take his son out of the vehicle's backseat. (Haywood's Dep. at 153-155 (ECF No. 70-1 at 42).)

- When Haywood reached to open the rear door, Marriot "attacked" him by grabbing his shoulder. (Haywood's Dep. at 155 (ECF No. 70-1 at 42).)

- Once Marriott grabbed Haywood's shoulder, he "knocked" her hand off of him. (Haywood's Dep. at 155 (ECF No. 70-1 at 42).)

- Marriot then slipped and started to fall. (Haywood's Dep. at 155 (ECF No. 70-1 at 42).)

- Haywood attempted to catch Marriot as she fell, but missed, and Marriot fell onto a wheelbarrow. (Haywood's Dep. at 155 (ECF 70-1 at 42).)

- Haywood caught Marriot before she fell onto the ground. (Haywood's Dep. at 155 (ECF 70-1 at 42).)

- Haywood took his son out of the vehicle, and Marriott called 911 to have the incident documented. (Haywood's Dep. at 156 (ECF No. 70-1 at 42).)

Marriott's testimony contradicted Haywood's testimony. She testified:

- Haywood grabbed Marriot and "put his arm around [her] to secure [her] so he could unlock the door and then [Haywood] went to the back of the car door with [Marriott] in tow and as soon as [Haywood] got the door unlocked, [Haywood] released [Marriott] and [Marriott] fell backwards." (Deposition of Beth Marriot ("Marriott's Dep.") at 39 (ECF No. 59-3 at 18).)

- "[Haywood] put his arm around [her] neck. His forearm and bicep were around [her] neck and he took [her] back." (Marriott's Dep. at 40 (ECF No. 59-3 at 19).)

- Marriott did not slip and fall [on her own] and there was no slush on the garage floor. (Marriott's Dep. at 43 (ECF No. 59-3 at 22).)

- Marriott had not been drinking and was not drunk on that day. (Marriott's Dep. at 42 (ECF No. 59-3 at 21).)

- Marriott called the police, who arrested Haywood and took him into custody for domestic battery with a child present. (Marriott's Dep. at 44, 180 (ECF No. 59-3 at 23, 38); Haywood's Dep. at 180 (ECF No. 59-2 at 130); C.S.F. ¶ 38 (ECF No. 72); St. Joseph's County Police Report ("Police Report") (ECF No. 59-3 at 4-6).)

Haywood went into police custody around 3:00 p.m. on December 31, 2010. (Police Report (ECF No. 59-3 at 4-6); ECF No. 59-3 at 157-166.) Police took photographs of marks on Marriott's body that were consistent with the version of events Marriott related to the police officer. (Police Report (ECF No. 59-3 at 4-6); ECF No. 59-3 at 157-166.) After Haywood's arrest on December 31, 2010, a judge in South Bend, Indiana determined there was probable cause that Haywood committed the offense of domestic battery with a child present. (C.S.F. ¶ 8 (ECF No. 72); Haywood Dep. at 221 (ECF No. 59-2 at 137); Police Report (ECF No. 59-3 at 4-6); ECF No. 59-3 at 2.)

### D.    The Termination of the Employment Contract

#### 1.  December 31, 2010

The University first learned about Haywood's arrest from Ernest J. Borghetti ("Borghetti"), senior associate athletic director of media relations for the University. (Deposition of E.J. Borghetti ("Borghetti's Dep.") at 14 (ECF No. 59-2 at 14); Pederson's Dep. at 33 (ECF No. 59-3 at 123).) Borghetti learned about Haywood's arrest and the national media coverage of his arrest after receiving a phone call from the New York Times. (C.S.F. ¶ 42 (ECF No. 72); Borghetti's Dep. at 14, 16, 50 (ECF No. 59-2 at 14); Pederson's Dep. at 33-34 (ECF No. 59-3 at 123-124); Deposition of Mark Nordenberg ("Nordenberg's Dep.") at 60 (ECF No. 59-2 at 60); Marriot's Dep. at 50-60 (ECF No. 59-3 at 27-34); Cochran's Dep. at 44-45 (ECF No. 59-3 at 58-59).) Haywood was aware there was press coverage of his arrest because when he "walked in to be booked, it was on ESPN." (Haywood's Dep. at 207 (ECF No. 59-2 at 132).) After learning about Haywood's arrest, the University began gathering information by searching online. (Borghetti's Dep. at 16 (ECF No. 59-2 at 14); Pederson's Dep. at 33 (ECF No. 59-3 at 123).) Elias learned about Haywood's arrest on ESPN "as the rest of the world" did. (Elias' Dep. at 66 (ECF No. 59-2 at 82).)

#### a.  Telephone Conversations Between Elias and the University

Elias had two telephone conversations with Cochran on the night of December 31, 2010, in which he informed Cochran that Haywood had in fact been arrested and that Elias was trying to get him out of jail. (Elias' Dep. at 69-70 (ECF No. 59-2 at 84-85).) Specifically, Elias testified he would have told the University two things Andre Gammage, Haywood's criminal defense attorney, told him: Haywood was probably going to spend the night in jail, and that Gammage "had spoken with the DA briefly and that there probably was not going to be formal charges

against [Haywood]." (Elias' Dep. at 78 (ECF No. 59-2 at 88).) Elias "wanted [Cochran] and [Pederson] to know that because [he knew] they were under a lot of heat and [he knew] what was being reported by ESPN. Any time you turned the thing on, they were talking . . . about all the allegations of domestic violence." (Id.)

Cochran recalled one conversation he had on December 31, 2010 with Elias and took notes of that conversation. (ECF No. 59-4 at 9.) Cochran also recalled "a conversation with somebody, indicating there had been a discussion with the prosecutor that [Haywood] was being held over until they found a judge. And the prosecutor had full intentions, and believed he had a strong case, to move forward." (Cochran's Dep. at 12 (ECF No. 59-3 at 44).) According to Cochran, either Elias or Gammage relayed this information to him, and it was his understanding that "the prosecutor was determining which specific charges to make." (Id. at 13). Cochran's understanding was that the prosecutor had a strong case but there seemed to be a problem, which Cochran "suspected it had to do with the holiday, or finding a judge." (Id. at 12-13.)

Elias also spoke with Steve Pederson ("Pederson"), the University's athletic director. (Elias' Dep. at 71 (ECF No. 59-2 at 86).) Elias told Pederson he did not know what Haywood had done, but told Pederson what he knew based upon information he received from media accounts and conversations with Gammage. (Elias' Dep. at 78 (ECF No. 59-2 at 88).) Pederson took notes of his telephone conversation with Elias. (Pederson's Dep. at 40 (ECF No. 59-3 at 128).) Pederson's notes indicate that Elias told Pederson that Haywood could not get into Marriott's residence, he forced his way through a barricaded door, a physical confrontation occurred, and Haywood was arrested. (ECF No. 59-4 at 22.)

### b. Telephone Conversations Between Gammage and the University

Pederson and Cochran also spoke with Gammage on December 31, 2010 and January 1, 2011. (C.S.F. ¶ 48 (ECF No. 72); Deposition of Andre Gammage ("Gammage Dep.") at 28-30, 50 (ECF No. 59-2 at 162-164; 170).) Gammage spoke with both Pederson and Cochran once or twice on the evening of December 31, 2010. (Gammage's Dep. at 29 (ECF No. 59-2 at 163).) Gammage testified he explained to Cochran or Pederson:

> That [Haywood] is in custody, that he is—that people in the prosecutor's office are reviewing the information they have to determine whether charges should or should not be filed and whether a misdemeanor or felony would be filed if charges were filed. I would have told them that I was—that I have been in touch with people in the prosecutor's office who made charging decisions, and I would have told him, and/or Mr. Cochran that I had been in touch with Mr. Walton [Marriott's attorney] and that I believed the allegations that have been made—that the person who made the allegations, that is Beth Marriot, that those allegations, the statement was going to change.

(Id. at 29-30). Gammage testified that at this time, no decision had been made with respect to charging Haywood, but "based on the allegations against him, they were going to keep [Haywood] overnight." (Id. at 32). Gammage does not remember talking to anyone the night of December 31, 2010 about the strength of the case against Haywood. (Id. at 33).

### c. The University's Statement on the Evening of December 31, 2010

On December 31, 2010 at 10:15 p.m., the University issued a statement acknowledging it was aware of the alleged incident between Haywood and Marriott, and that it expected the highest standard of conduct from its employees, including coaches, and that a breach of that standard was a very serious matter. (C.S.F. ¶ 51 (ECF No. 72); ECF No. 59-4 at 11).)

## 2. The Morning of January 1, 2011

Gammage testified that he kept in contact with Cochran the morning of January 1, 2011 and would have told Cochran "I'm still on the case, stay awake. Something is going to happen

within the next few hours." (Gammage's Dep at 50 (ECF No. 59-2 at ).) On the morning of January 1, 2011, Nordenberg, Cochran, Borghetti, and Pederson met in Nordenberg's office to discuss the University's position with respect to Haywood (the "morning meeting"). (C.S.F. ¶ 53 (ECF No. 72); Pederson's Dep. at 8, 67 (ECF No. 70-1 at 128, 143).) Pederson testified that based upon the information the University had at the time of the morning meeting, the University was "clearly nearing a point at which it was likely that [the University] would terminate him." (Pederson's Dep. at 67-68 (ECF No. 70-1 at 143).) Pederson testified "but until I talked to [Haywood] on the phone and called and reported that conversation to the chancellor, I don't believe any final conclusion had been reached." (Pederson's Dep. at 58 (ECF No. 59-3 at 136).)

Nordenberg testified:

> We had in—in our discussions, I think there was a general agreement that, based on the information that we knew, there was cause for termination, and it was my position that we should move forward with termination unless we had the opportunity to talk with Mr. Haywood and there was nothing he said that would have changed that position or unless, while we were waiting for a conversation with Mr. Haywood, we learned something else.

(Nordenberg Dep. at 20 (ECF No. 59-2 at 56).)

Cochran testified this determination was made based upon the information Elias or Gammage told him and the media coverage of Haywood's conduct and arrest. (Cochran's Dep. at 42, 44-45 (ECF No. 59-3 at 57-59).) At the morning meeting, Nordenberg, Cochran, Borghetti, and Pederson discussed the employment contract's provisions. (C.S.F. ¶ 56 (ECF No. 72); Pederson Dep. at 104-105 (ECF No. 59-3 at 152-153).)

Cochran advised Nordenberg that the University could terminate Haywood with just cause under paragraph 14.1 of the employment contract. Paragraph 14.1 provided that just cause meant "as determined by the University any conduct of the employees that is seriously prejudicial to the best interest of the University," that is "seriously prejudicial to the best interest

of the of the University or its inter-collegiate athletics program; that violates the University's or the Department's then current mission; that brings the University into disrepute; or that reflects . . . moral turpitude." (C.S.F. ¶ 57 (ECF No. 72); Employment Contract ¶ 14 (ECF No. 14-1).)

Cochran testified Nordenberg was the University's decision maker with respect to Haywood's employment, but that Nordenberg sought advice and counsel from Cochran, Pederson, and Borghetti. (Cochran's Dep. at 5-6 (ECF No. 70-1 at 158); Nordenberg's Dep. at 5 (ECF No. 59-2 at 51).)

### 3. The Afternoon of January 1, 2011

Cochran asked Timothy Delaney ("Delaney"), Chief of Police for the University of Pittsburgh Police Department, to contact his counterpart at the University of Notre Dame to make contact with law enforcement officials in South Bend, Indiana. (Cochran's Dep. at 14 (ECF No. 59-3 at 46).) On January 1, 2011, at 12:22 p.m., Delaney responded to Cochran via email, writing the sheriff "could not release the report at this time due to its status as an ongoing investigation." (Cochran's Dep. at 15 (ECF No. 70-1 at 160).)

The University received three emails from alumni and parents of University students urging the University to terminate Haywood. (ECF No. 59-4 at 5-7.) The first email was sent at 1:23 a.m. on January 1, 2011, and the two other emails were sent shortly after noon on January 1, 2011. (ECF No. 59-4 at 5-7.)

At 1:19 p.m. on January 1, 2011, Borghetti sent Nordenberg an email with a draft of a termination statement with respect to Haywood. (Pederson's Dep. at 97 (ECF No. 59-3 at 151).)

By the afternoon of January 1, 2011, the University decided it was going to terminate Haywood unless something happened to suggest that the University should reconsider.

(Cochran's Dep. at 22-23, 25 (ECF No. 59-3 at 47-49); Pederson's Dep. at 57-58, 68 (ECF No. 59-3 at 141, 143).)

### a. Telephone Conversation Between Gammage and Cochran

Gammage testified he spoke with Cochran on the afternoon of January 1, 2011, and informed Cochran that Haywood had been charged. (Gammage's Dep. at 49 (ECF No. 70-1 at 169).) Gammage testified he spoke with Cochran multiple times on January 1, 2011. (Id. at 50) Gammage told Cochran that Haywood had been charged around 12 p.m., 1 p.m., or right before Haywood was released from custody. (Id.) Gammage testified he told Cochran the charges filed against Haywood, but did not tell Cochran the evidence the state had against Haywood. (Id. at 51.)

### b. Telephone Conversation Between Cochran and Elias

On January 1, 2011 at 3:10 p.m., Cochran called Elias on the telephone to inform him that the University intended to terminate Haywood's employment. (C.S.F. ¶ 62 (ECF No. 72); Nordenberg Dep. at 12 (ECF No. 59-2 at 54); Cochran Dep. at 11, 23, 36-37 (ECF No. 59-3 at 43, 48, 55-56).) Elias testified that Cochran told him during the conversation "irrespective of guilt or innocence, the University of Pittsburgh is going to terminate its relationship with Mike Haywood." (Elias' Dep. at 83 (ECF No. 70-1 at 107).) Elias asked Cochran to wait and talk to Haywood before making this determination. (Cochran Dep. at 24 (ECF No. 70-1 at 162); Elias' Dep. at 83 (ECF No. 70-1 at 107).) Cochran told Elias that speaking to Haywood was not necessary, as "it made no difference" because "[w]e were clearly at a point where we were going to fire [Haywood]. We had not made a final decision or announced a final decision." (Cochran's Dep. at 24-25 (ECF No. 70-1 at 162-163).) Cochran testified the decision to terminate Haywood

was made "certainly before [Cochran] talked to [Haywood]." (Cochran's Dep. at 25 (ECF No. 59-3 at 49).)

After the telephone conversation between Cochran and Elias, Elias telephoned Haywood's parents and Gammage to inform them that the University terminated Haywood's employment. (Elias Dep. at 86 (ECF No. 70-1 at 108).)

### c. Haywood's Release From Custody on January 1, 2011, at 3:30 p.m.

After Haywood's release from custody on January 1, 2011, at 3:30 p.m., Elias informed Haywood that his employment with the University was terminated. (Elias Dep. at 85 (ECF No. 70-1 at 108).) Haywood was disoriented after his release and wanted to go to Pittsburgh to talk to Pederson and Cochran. (Elias Dep. at 85, 87-89 (ECF No. 70-1 at 108-109).)

### d. Haywood's Telephone Conversation with Cochran

On January 1, 2011, at 3:50 p.m., Haywood called Cochran on the telephone and spoke to him for fourteen minutes. (C.S.F. ¶ 64 (ECF No. 72); Cochran Dep. at 26-27 (ECF No. 59-3 at 50-51); ECF No. 59-4 at 18.) Haywood explained his version of events that led to his arrest. (C.S.F. ¶ 64 (ECF No. 72); Cochran Dep. at 26-27 (ECF No. 59-3 at 50-51); ECF No. 59-4 at 18.) Haywood testified he was in a high emotional state during the telephone conversation and thought he was talking to Pederson, rather than Cochran. (Haywood's Dep. at 215 (ECF No. 70-1 at 57).) Haywood testified he told Cochran that media reports were wrong because he did not choke Marriot. (Haywood's Dep. at 216 (ECF No. 59-2 at 135).) Haywood testified that Marriott attacked him by grabbing his shoulder, he knocked her hand off him, and she slipped and fell into a wheelbarrow. (Id.) Haywood testified he told Cochran that he was on his way back to Pittsburgh, Pennsylvania, from South Bend, Indiana, to explain what happened on December 31, 2010, because the media reports were inaccurate. (Haywood's dep. at 216 (ECF No. 59-2 at

135).) Haywood testified he told Cochran he would be in Pittsburgh, Pennsylvania, "first thing tomorrow morning." (Haywood's Dep. at 216 (ECF No. 59-2 at 135).) Haywood testified Cochran said "Okay." (Haywood's Dep. at 216 (ECF No. 59-2 at 135).)

Based upon this conversation with Haywood on January 1, 2011, Cochran determined Haywood exercised poor judgment by going into the residence, getting into an argument with Marriott, and placing himself in a situation that led to Haywood's arrest. (C.S.F. ¶ 67 (ECF No. 72); Cochran's Dep. at 34 (ECF No. 59-3 at 54).)

Cochran testified that the University made its decision to terminate Haywood for just cause based upon the following: Haywood breaking through the barricaded door of the residence, engaging physically with Marriott, and acting in a way which led to Haywood's arrest. (C.S.F. ¶ 58 (ECF No. 72); Cochran's Dep. at 60,61, 64-65 (ECF No. 59-3 at 67-68, 69-70).)

### e. Haywood's Telephone Conversation with Pederson

On January 1, 2011, at 4:28 p.m., Haywood spoke to Pederson and reported that his relationship with Marriott had been deteriorating. (C.S.F. ¶ 68 (ECF No. 72); Pederson Dep. at 71-72, 78, 93 (ECF No. 59-3 at 141-142, 146, 150); ECF No. 59-4 at 22; ECF No. 59-4 at 18.) Pederson took notes during this conversation. (ECF No. 59-4 at 22-3.) Haywood told Pederson what happened on December 31, 2010, and that Marriott had blocked, or barricaded, the door to the residence. (Haywood's Dep. at 218 (ECF No. 67-1).) Pederson's notes indicate Haywood told him the door was "barricaded" and Marriot "fell over a little kids [sic] floaty" and Haywood "caught [Marriott] as she fell over a wheel barrel." (ECF No. 59-4 at 22.) Pederson testified that Haywood's statement that he had entered the residence through a barricaded door was sufficient for Pederson to determine that Haywood's lack of judgment put Haywood in a position that made it impossible for Haywood to continue as the University's head football coach. (C.S.F. ¶ 70

(ECF No. 72); Pederson Dep. at 82 (ECF No. 59-3 at 148).) Pederson's notes of the conversation indicate that Haywood apologized to the University and stated, "I truly understand what position this puts you guys in." (ECF No. 59-4 at 23.)

Haywood does not remember the telephone conversation with Pederson from January 1, 2011, and does not remember apologizing to him. (Haywood's Dep. at 218 (ECF No. 59-2 at 136).)

### f. Pederson and Cochran Relay Their Conversations to Nordenberg

On January 1, 2011, Pederson and Cochran informed Nordenberg about their conversations with Haywood. (Nordenberg's Dep. at 18 (ECF No.59-2 at 55) Nordenberg testified that after receiving that information, the University made the final decision to terminate Haywood. (Id.) Nordenberg testified that Haywood's accounts of the events on December 31, 2010, confirmed the media reports and did not provide new information to change the University's decision with respect to whether Haywood's employment should continue. (C.S.F. ¶ 75 (ECF No. 72); Nordenberg Dep. at 18, 45 (ECF No. 59-2 at 55, 63).)

Nordenberg believes the University quickly, but carefully, conducted a reasonable inquiry into the circumstances around Haywood's arrest prior to his termination. (C.S.F. ¶ 76 (ECF No. 72); Nordenberg Dep. at 59, 66, 81 (ECF No. 59-2 at 66, 69, 79).) Nordenberg testified that he determined Haywood engaged in conduct which provided the University just cause to terminate him, including bringing the University into disrepute and engaging in conduct which was "seriously prejudicial to the best interest of the University or its inter-collegiate sports athletic program." (C.S.F. ¶ 78 (ECF No. 72); Nordenberg's Dep. at 7, 27-28, 71-73 (ECF No. 59-2 at 52, 59-60, 73-75); Cochran's Dep. at 51-52 (ECF No. 59-3 at 60-61).)

**4. The University's Press Release**

At 5:26 p.m. on January 1, 2011, Nordenberg sent an email to the members of the University's board of trustees informing them that the decision was made to terminate Haywood. (ECF No. 59-4 at 31-32.) The email provided, in pertinent part:

> [W]e wanted to wait until he was released from custody and had the opportunity to personally communicate with us before finalizing a course of action. After he had spoken with both Jerry [Cochran] and Steve [Pederson], we re-convened and concluded that this was the proper path for the University

(ECF No. 59-4 at 31.) The email contained a press release that would be issued to the public announcing Haywood's termination. (Id. at 31-32.)

At 5:42 p.m. on January 1, 2011, the University issued the press release announcing the termination of Haywood's employment with the University. (C.S.F. ¶ 81 (ECF No. 72); Nordenberg's Dep. at 25-26 (ECF No. 59-2 at 57-58); Borghetti Dep. at 37-38 (ECF No. 59-2 at 100-01).) The press release provided, in part:

> After careful consideration of recent events, the University of Pittsburgh has dismissed Michael Haywood as its head football coach, effective immediately. He was advised of that action this afternoon.

(ECF No. 59-4 at 34.)

**E. The University's January 4, 2011 Letter with respect to Termination of the Employment Contract**

On January 4, 2011, the University mailed Haywood a letter, signed by Cochran, that confirmed Haywood's termination. (ECF No. 59-4 at 39.) The letter provided, in part:

> This letter will serve as written confirmation of the notice I provided to your agent, Albert Elias, by telephone on Saturday, January 1, 2011. Specifically, effective as of the time of that call to Mr. Elias on January 1, 2011, the University of Pittsburgh has terminated your Employment Contract with the University for Cause.

(Id.)

### F. The Stipulation of the Events of December 31, 2010

On February 11, 2011, Haywood and Marriott agreed to a stipulation ("stipulation") with respect to the events of December 31, 2010. (Haywood-Marriott Stipulation of Events ("Stipulation") (ECF No. 59-2 at 143-145).) The stipulation provided that the State of Indiana agreed to withhold prosecution of domestic battery, a class A misdemeanor, if Haywood complied with each term of the agreement. (Stipulation (ECF No. 59-2 at 148-149).) The stipulation provided:

> [O]n December 31, 2010, [Haywood] knowingly touched Beth Marriott, a person with whom [Haywood] had a child in common, in a rude, insolent or angry manner, and that this touching resulted in bodily injury. Specifically, [Haywood was] admitting that [Haywood] got into an argument with Miss Marriott, that [Haywood] confronted her, and during the confrontation [Haywood] pushed the victim. As a result of [Haywood's] actions, [Marriott] fell down and suffered pain.

(Stipulation (ECF No. 59-2 at 144).) The stipulation provided that if the case ever went to trial, the stipulation would be binding. (Stipulation at 43 (ECF No. 59-2 at 144).) Haywood agreed to the terms of the stipulation. (Stipulation (ECF No. 59-2 at 151).) Haywood testified he signed the stipulation because "it was the only way in which we were going to get a pretrial diversion, and [he] wanted this to be over as fast as possible." (Haywood's Dep. at 240 (ECF No. 70-1 at 63).)

### G. Confidentiality and the Employment Contract

In June 2011, Haywood, Gammage, and Elias approved a press release by The Buzbee Law Firm that contained certain of the financial terms set forth in the employment contract. (Haywood's Dep. at 273-274 (ECF No. 59-2 at 138-139); ECF No. 59-3 at 2).) The press release provided, in part:

> Michael Haywood, former head coach of the University of Pittsburgh football team, has asked the Pennsylvania Human Relations Commission and other state and federal agencies to investigate the university's firing of him, The Buzbee Law Firm announced today.

In a corresponding notice letter sent to the university, Haywood attorney Tony Buzbee raises concerns about Pitt's lack of investigation and the coach's termination sixteen days after he was hired.

Buzbee said, "In their rush to judgment, Pitt officials did not bother to contact the alleged victim or even the coach himself. I believe the university violated its contract with the coach, the university's employment procedures, and the Due Process Clause of the U.S. Constitution. Had Pitt conducted even a cursory investigation, it would have determined that the alleged incident simply did not occur as reported, and the termination would not have occurred. We are exploring other motives for Pitt's firing of Coach Haywood."

Haywood's five-year contract with Pitt would have paid him up to $7.5 million, plus other incentives.

(ECF No. 59-3 at 2.) Haywood knew the press release would be sent to numerous media outlets. (Haywood's Dep. at 275 (ECF No. 59-2 at 138-139).) Haywood did not know that a representative from The Buzbee Law Firm would be making appearances on television programs discussing Haywood's termination as the University's head football coach. (Id.) Elias testified, "USA Today has every salary of every coach known to man. You could get that." (Elias' Dep. at 110 (ECF No. 59-2 at 90).) Elias also testified "the whole world knows" the financial terms stated in the press release. (Id.)

## IV.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of

record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.")

The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course defeat a motion for summary judgment but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. The court may consider material evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("[I]n considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence.").

## V.  *Discussion*

### A.  Count A—Breach of Written Contract

To prove a breach of contract claim under Pennsylvania law, a plaintiff must demonstrate (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003). The University contends "the undisputed facts demonstrate that Mr. Haywood cannot meet his burden on the second and third of these elements," i.e., "no reasonable jury could find that the University breached the [Employment] Contract," or that an alleged breach resulted in

damages. (ECF No. 58.) The parties do not dispute the existence of an agreement, i.e., the employment contract. The parties dispute the facts with respect to the second and third elements of Haywood's prima facie case, i.e., breach of a duty under the employment contract and resultant damages to Haywood.

Haywood in count A of the complaint alleges the University breached the employment contract by refusing to pay him liquidated damages under paragraph 14.2 of the employment contract when it terminated him without just cause. (ECF No. 1 at 6.) Inherent in this claim is an allegation that the University breached the contract because it did not act in good faith in determining the University had just cause to fire him. Haywood in his brief in response to the University's motion for summary judgment concedes the University terminated him with just cause, but argues the University's "arbitrary interpretation of the just cause provision of the employment contract effectively renders Mr. Haywood's termination as one 'without just cause' under the employment contract, which obligates Defendant to pay to Mr. Haywood liquidated damages." (ECF No. 68 ¶ 2.) Haywood argues: "[A]t the time [the University] decided to terminate [him], it had not conducted any reasonable, good faith investigation in to [sic] the circumstances giving rise to [his] arrest." (ECF No. 68 at 2.) According to Haywood, the University's actions "violated the duty of good faith in all contracts executed under Pennsylvania law" and rendered his termination as one "without just cause." (Id.)

The University in its motion for summary judgment argues "[t]he [Employment] Contract did not contain any requirement that the University conduct an investigation, hold a hearing, seek Mr. Haywood's consent, or await the outcome of a criminal trial prior to just cause termination." (ECF No. 58 at 10.) The University argues that "the [Employment] Contract expressly afforded the University the sole discretion to determine when just cause existed for certain categories of

conduct," and that it terminated Haywood with just cause pursuant to paragraph 14.1(F) of the employment contract. (Id.) The University argues that under those circumstances, it did not breach the employment contract by refusing to pay Haywood liquidated damages (Id.)

## 1. The Implied Duty of Good Faith

Section 205 of the Restatement (Second) of Contracts provides: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[1] RESTATEMENT (SECOND) CONTRACTS § 205 (quoted by <u>W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank</u>, 712 F.3d 165, 170 (3d Cir. 2013)). Two justices of the Pennsylvania Supreme Court have noted in non-precedential opinions that section 205 has been adopted. <u>Bethlehem Steel Corp. v. Litton Indus., Inc.</u>, 488 A.2d 581, 600 (Pa. 1985) (Zappala, J., opinion in support of reversal); <u>Frickert v. Deiter Bros. Fuel Co.</u>, 347 A.2d 701, 705 (Pa. 1975) (Pomeroy, J., concurring). The Pennsylvania Supreme Court, however, while acknowledging those comments, chose not to formally adopt section 205. <u>Ash v Cont'l Ins. Co.</u>, 932 A.2d 877, 883 n.2 (Pa. 2007) ("Despite the apparent conflict over the applicability of the implied duty of good faith, we decline to engage in a discussion of this issue as it is not presently before us."). Pennsylvania intermediate appellate courts in accord with the comments of those two justices have followed section 205. <u>See e.g.</u>, <u>Stamerro v. </u>Stamerro, 998 A.2d 1251, 1259 (Pa. Super. Ct. 2005); <u>Herzog v. Herzog</u>, 887 A.2d 313, 317 (Pa. Super. Ct. 2005); <u>Palmieri v. Partridge</u>, 853 A.2d 1076, 1079 (Pa. Super. Ct. 2004). Federal courts applying Pennsylvania law have predicted the Pennsylvania Supreme Court would adopt section 205 if presented the opportunity. <u>Kamco</u>

---

[1] "A claim for breach of the covenant of good faith and fair dealing sounds in contract law, because the covenant 'arises from the contract itself.'" <u>Stewart v. SWPI, LP</u>, 918 F.Supp.2d 333, 343 (M.D. Pa. 2013). It follows that "[a] plaintiff pursuing an implied duty theory must bring a breach of contract action not an independent cause of action of breach for the covenant of good faith and fair dealing." <u>Kamco</u>, 779 F.Supp.2d at 426 n.8.

Indus. Sales, Inc. v. Lovejoy, Inc., 779 F.Supp.2d 416, 425 (E.D. Pa. 2011) (citing Zaloga v. Provident Life & Accident Ins. Co. of Am., 671 F.Supp.2d 623, 630 (M.D. Pa. 2009); W. Sur. Co. v. WGG, Inc., Civ No. 07-1551, 2009 WL 222429, at *3 (M.D. Pa. Jan. 29, 2009); Fitzpatrick v. State Farm Ins. Cos., Civ. No. 09-1498, 2010 WL 2103954, at 3 (W.D. Pa. May 25, 2010)).This court agrees with the prediction that "the Pennsylvania Supreme Court would adopt Section 205 of the Restatement if squarely confronted with the question." Kamco Indus. Sales, Inc. v. Lovejoy, Inc., 779 F.Supp.2d 416, 425 (E.D. Pa. 2011) (citing, inter alia, Zaloga v. Provident Life & Accident Ins. Co. of Am., 671 F.Supp.2d 623, 630 (M.D. Pa. 2009)); accord W. Run Student Hous., 712 F.3d at 170. It follows that the employment contract imposed a duty of good faith upon Haywood and the University in their performance of its terms.

The Third Circuit Court of Appeals has noted that the implied duty of good faith in Pennsylvania "is not limitless. Rather, there must be some relationship to the provisions of the contract itself to invoke the duty of good faith." W. Run Student Hous., 712 F.3d at 170. Here, the contractual provision in issue is paragraph 14.1 of the employment contract, which provided that the University

> may at any time, **with just cause**, terminate this [employment] Contract or suspend Employee without pay. In the event of such termination, the University shall be relieved of all further obligations (financial and otherwise) to Employee.

(Employment Contract ¶ 14.1 (ECF No. 14-1 at 18)) (emphasis added.) Just cause under the employment contract is defined as, among other things:

> **as determined by the University**, any conduct of Employee that is seriously prejudicial to the best interest of the University or its intercollegiate athletics program; that violates the University's or the Department's then-current mission; that brings the University into disrepute; or that reflects dishonesty, disloyalty,

willful misconduct, gross negligence, moral turpitude or refusal or unwillingness to perform his duties.[2]

(Employment Contract ¶ 14.1 (F) (ECF No. 14-1 at 19-20)) (emphasis added.) Under the employment contract the University had the duty to act reasonably in making the determination with respect to whether Haywood's conduct on December 31, 2010, fell within the ambit of paragraph 14(F). The implied duty of good faith, however, cannot "override the express terms of a contract;" indeed, "the covenant of good faith does nothing more than fill in those terms of a contract that have not been expressly stated." Phila. Plaza-Phase II, 2002 WL 1472337, at *5. "Otherwise, the court would violate the axiom that it 'not imply a different contract than that which the parties have expressly adopted.'" W. Run Student Hous., 712 F.3d at 170 (quoting Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 388 (Pa. 1986)).

"[T]he covenant of good faith and fair dealing[, when applicable,] acts as a term of the contract, and that covenant arises from the contract itself." Zaloga, 671 F.Supp.2d at 630-31 (citing Ash, 932 A.2d at 884). A breach of the implied duty of good faith is, therefore, a breach of the contract between the parties. Whether a party failed to exercise good faith in its performance of the contract is a fact-based inquiry. The Pennsylvania Superior Court has noted:

> "[A] complete catalogue of types of bad faith is impossible, but it is possible to recognize certain strains of bad faith which include: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."

Stamerro, 889 A.2d at 1259 (quoting Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992). "'The covenant of good faith may also be breached when a party exercises discretion

_____

[2] Courts addressing provisions similar to paragraph 14.1(F) refer to those kinds of provisions as "morals clauses." Galavis v. Post-Newsweek Stations, 380 F. App'x 457, 459 (5th Cir. 2010); Nader v. ABC Television, Inc., 330 F. Supp. 2d 345, 346 (S.D.N.Y. 2004).

authorized in a contract in an unreasonable way.'" Montanez v. HSBC Mortg. Corp., 876 F.Supp.2d 504, 513 (E.D. Pa. 2012) (quoting Phila. Plaza-Phase II v. Bank of Am. Nat'l Trust & Savs. Assoc., No. 3745 April Term 2002, 2002 WL 1472337, at *6 (Pa. Ct. C.P. Phila. Cnty. June 21, 2002)).

The University argues that Haywood cannot prove it breached the employment contract by violating its duty to act in good faith because the employment contract expressly provided the University the discretion to determine that just cause existed to terminate him. (ECF No. 58 at 9.) According to the University:

> The Contract did not contain any requirement that the University conduct an investigation, hold a hearing, seek Mr. Haywood's consent, or await the outcome of a criminal trial prior to a just cause determination. Instead, the Contract expressly afforded the University sole discretion to determine when just cause existed for certain categories of conduct.

(Id. at 10.) The University argues the implied duty of good faith "does not save Mr. Haywood's claim because an implied duty cannot conflict with the written contract." (Id. at 13.-14.) The University is correct that under the employment contract it had the discretion under paragraph 14.1(F) to determine whether it had just cause to fire Haywood. When a party has the discretion to act under a contract, however, the implied duty of good faith requires the party to reasonably exercise that discretion. The duty to act reasonably did not *override* the University's right to terminate the employment contract upon its determination that Haywood's conduct fell within the ambits of paragraph 14.1(F), i.e., his conduct was

> seriously prejudicial to the best interest of the University or its intercollegiate athletics program; that violates the University's or the Department's then-current mission; that brings the University into disrepute; or that reflects dishonesty, disloyalty, willful misconduct, gross negligence, moral turpitude or refusal or unwillingness to perform his duties.

(ECF No. 14-1 ¶ 14.1(F).) Likewise, the duty of good faith did not require the University to take any specific action prior to terminating the employment contract; rather, inherent in the University's right to determine whether just cause existed to terminate the employment contract was the implied duty to act reasonably to make that determination.

### 2. Termination of the Employment Contract

Whether the University acted reasonably in determining Haywood's conduct on the night of December 31, 2010, provided it with just cause to terminate the employment contract under paragraph 14.1(F) depends upon the University's conduct and knowledge prior to terminating the employment contract. As discussed <u>infra</u>, there are disputes of fact with respect to when, i.e., at what point in time, the employment contract was terminated.[3] The general rule in Pennsylvania with respect to contract termination is:

> To be effective, a notice for the rescission or termination of a contract must be clear and unambiguous, conveying an unquestionable purpose to insist on the rescission. And where the conduct of one having the right to rescind a contract is ambiguous, and it is not clear whether he has rescinded it or not, he will be deemed not to have done so.

<u>Int'l Diamond Imp., Ltd. v. Singularity Clark, L.P.</u>, 40 A.3d 1261, 1271 (Pa. Super. Ct. 2012) (citing <u>Wright v. Bristol Patent Leather Co.</u>, 101 A. 844, 845 (Pa. 1917)). The Pennsylvania

---

[3] Haywood contends the employment contract was terminated at the January 1, 2011 morning meeting. The evidence of record does not support a reasonable jury finding that the University communicated a clear and unambiguous intent to terminate the employment contract to Elias or Haywood during the morning of January 1, 2011. Haywood's argument that the morning meeting constituted termination is, therefore, without merit. The University does not specifically point to evidence indicating at what specific time the employment contract was terminated. Cochran telephoned Elias to inform him about the termination at 3:10 p.m. that day. The University does contend, however, that Nordenberg terminated the employment contract after Pederson and Cochran spoke to Haywood and heard his version of the events that led to his arrest on December 31, 2010. (Nordenberg's Dep. at 27 (ECF No. 59-2 at 59).) These conversations with Haywood took place after Haywood's telephone conversation with Cochran at 3:50 p.m. but before the 5:36 p.m. email from Nordenberg to the board of trustees and the issuance of the public statement at 5:42 p.m.

Supreme Court has held that "[m]ere general statements of an intention to do something are no more than assertions." Berwick Hotel Co. v. Vaughn, 150 A. 613, 616. "[A]mbiguous indications of intent to terminate or rescind an agreement—whether written or oral—[are] deemed insufficient to do so." Int'l Diamond Imp., Ltd., 40 A.3d at 1271; see Wright, 101 A. at 845; Accu-Weather, Inc. v. Prospect Commc'n, Inc., 644 A.2d 1251, 1254 (Pa. Super. Ct. 1994).

Evidence of record indicates there are three possible events that arguably could be the time of termination of the employment contract: (1) the January 1, 2011, 3:10 p.m. telephone conversation between Cochran and Elias; (2) the press release issued by the University on January 1, 2011 at 5:42 p.m.; and (3) the letter the University mailed to Elias on January 4, 2011.

### 3. The Cochran and Elias Telephone Conversation on January 1, 2011

Haywood argues the University terminated the employment contract without cause via the Cochran and Elias telephone conversation on January 1, 2011. This argument lacks merit. A reasonable jury could not find the telephone conversation operated as termination of the employment contract without just cause because termination without just cause pursuant to paragraph 14.2 must be effectuated by writing; indeed, without a writing, the telephone conversation could not serve as an unambiguous conveyance of an unquestionable purpose to insist on the rescission of the employment contract without just cause. In other words, without written notification of termination, Haywood's contract would still be in effect, unless the oral notification was based upon just cause. At the time of the Cochran and Elias telephone conversation, the evidence of record shows a genuine dispute with respect to whether just cause existed at that time. If just cause did not exist, a jury only could conclude the employment contract was not terminated during the Cochran and Elias telephone conversation on January 1, 2011.

### a. Termination of the Employment Contract

During the afternoon of January 1, 2011, Cochran telephoned Elias at 3:10 p.m. to inform him that the University was terminating Haywood. (C.S.F. ¶ 62 (ECF No. 72).) Cochran testified with respect to Haywood's termination as follows:

> Q: And this letter [the January 4, 2011 letter] was just written confirmation of that oral notice that you provided to Mr. Haywood's agent on January 1, correct?
>
> A: It could be characterized as such. My conversation with Mr. Elias on the 1st was to inform him that it was the University's intention to terminate his client. This letter confirmed his client's termination.
>
> Q: So it is your testimony that when you spoke with Mr. Elias on January 1, you did not tell him that the University was going to terminate Mr. Haywood?
>
> A: I told him that the University's intention was to terminate his client.
>
> Q: So the decision had been made at the time you spoke with Mr. Elias that [the University] was going to terminate Mr. Haywood, correct?
>
> A: The decision was made that it was our intention to terminate Mr. Haywood unless there was a reason not to.
>
> Q: So you went ahead before Mr. Haywood was released from custody, notified his agent that it was the intention of the University to dismiss Mr. Haywood, correct?
>
> A: Correct.

(Cochran Dep. at 11, 23 (ECF No. 59-3 at 43, 48).) Elias, on the other hand, testified with respect to Haywood's termination as follows:

> Q: Were you the one person that Mr. Cochran delivered the termination news to by telephone on New Years Day?
>
> A: Yes. Around 12 o'clock New Year's Day or whatever the time was he called me. I don't know if he called anybody else, but I'm the one that told [Haywood].
>
> Q: When you spoke with Mr. Cochran during the conversation when he told you that [the University] was terminating Mr. Haywood, was there any doubt in your mind as to whether that was a final decision?

A: Absolutely Not.

Q: Okay. You testified about the conversation you had with Mr. Cochran where he advised you that [the University] was terminating Mr. Haywood. Do you remember that?

A: Yeah.

Q: Okay. During that conversation did Mr. Cochran indicate that this decision was not a final decision?

A: No. And I'm very emotional about this but, no, it was a final decision while [Haywood] was still in jail. And I had to give that decision to his parents. So absolutely that man told me 100 percent that they were moving away and that they didn't even spend the time to help get him out of jail.

Q: Okay. Well let me ask you this: During your conversation with Mr. Cochran where he stated [the University] was going to fire [Haywood], did he ever state to you that it was only [the University]'s intention to fire [Haywood] and that there would be a final decision made later?

A: No. It was the final decision. He wouldn't even let me answer it. He just stated due to his—due to lack of guilt or innocence, [Haywood] has lost his ability to lead this program and hung the phone up. That was it.

Q: Did he tell you that he was terminated?

A: He told me that he was terminated right then and there and that he did not want to speak with him anymore, that I'd have to give the news to him and I had to give it to his parents. It was no question in my mind when that man called me that he had terminated [sic] the decision and [Haywood] was still in jail.

Q: When you spoke with Mr. Cochran during this conversation where he stated that [the University] was terminating Mr. Haywood, did Mr. Cochran tell you what contract provision justified Mr. Haywood's termination?

A: He said irrespective of guilt or innocence, Mike Haywood has lost his ability to lead this University and he is terminated immediately. That's what he said and he hung up the phone.

(Elias' Dep at 139-42 (ECF No. 70-1 at 121-22).)

In accord with Elias' testimony, the press release issued by the University on January 1, 2011 at 5:42 p.m. provided:

> After careful consideration of recent events, the University of Pittsburgh has dismissed Michael Haywood as its head football coach, effective immediately. **He was advised of that action this afternoon.**

(ECF No. 59-4 at 34 (emphasis added).) Three days later on January 4, 2011, the University mailed Haywood a letter, signed by Cochran, confirming that Haywood's termination took place on January 1, 2011, during the telephone conversation between Cochran and Elias. (ECF No. 59-4 at 39.) The letter provided, in part:

> This letter will serve as written confirmation of the notice I provided to your agent, Albert Elias, by telephone on Saturday, January 1, 2011. Specifically, effective as of the time of that call to Mr. Elias on January 1, 2011, the University of Pittsburgh has terminated your Employment contract with the University for Cause.

(Id.)

In light of the conflicting evidence with respect to Cochran and Elias' telephone conversation on January 1, 2011, at 3:10 p.m., there is a dispute of fact with respect to whether the telephone conversation between Cochran and Elias operated as a termination of the employment contract. The parties dispute what was said during the telephone conversation between Cochran and Elias and whether the telephone conversation operated as a clear and unambiguous notice of termination of the employment contract. In considering contract termination, the Pennsylvania Supreme Court has held: "The effect of a notice depends upon its terms; and we cannot say, as a matter of law, that these vague oral manifestations" gave definitive information that the employment contract was terminated. Berwick Hotel Co., 150 A. at 616. A jury must determine the credibility of the witnesses, reconcile the conflicting testimony, and the weight to be given to the University's press release and letter to Haywood. A reasonable jury could find Elias' testimony credible and determine Cochran's and Elias' telephone conversation operated as a termination of the employment contract. On the other hand,

if a jury found Cochran's testimony about the telephone conversation credible, the telephone conversation would merely be "ambiguous indications of intent to terminate" the employment contract, and thus, insufficient to operate as termination of the employment contract. Int'l Diamond Imp., 40 A.3d 1261, 1271 (Pa. Super. Ct. 2012); see Wright, 101 A. at 845; Accu-Weather, Inc. 644 A.2d at 1254.

### b. The University's exercise of good faith

In considering whether the Cochran and Elias telephone conversation operated as a just cause termination of the employment contract, a jury would need to assess whether the University acted in good faith in making its determination that Haywood caused the University disrepute. This fact-based inquiry depends upon what the University did and knew at the time of the Cochran and Elias telephone conversation. The undisputed facts of record show that at the time of the Cochran and Elias telephone call:

- Borghetti learned about Haywood's arrest from the New York Times;

- The University gathered information about Haywood's conduct from the internet;

- Cochran spoke with Elias on the telephone and learned Haywood was arrested;

- The University learned Haywood was probably going to spend the night in jail;

- Pederson spoke with Elias;

- Pederson and Cochran each spoke with Gammage at least once;

- Nordenberg, Cochran, Pederson, and Borghetti met to discuss what they knew;

- Cochran requested information from Delaney, Chief of Police for the University of Pittsburgh Police Department. Delaney stated that the sheriff in South Bend, Indiana "could not release [Haywood's police] report at

35

this time due to its status as an ongoing investigation." (Cochran's Dep. at 15 (ECF No. 70-1 at 160)).);

- The University received three emails from alumni and parents of University students urging the University to terminate Haywood;

- The University searched various Pittsburgh media outlets, including newspaper, radio, and television reports covering Haywood's arrest. (Cochran's Dep. at 44 (ECF No. 59-3 at 58)).); and

- The University at no time prior to the Cochran and Elias telephone conversation spoke with Haywood.

There, however, exist disputes of fact with respect to what was said during Pederson's and Cochran's conversations with Gammage and Elias on January 1, 2011. Cochran testified that Gammage or Elias told him:

> Mr. Haywood had been arrested. He apparently was involved in an altercation with Beth Marriot. She called the police, 911. There were marks on her. Where he got his information, I do not know, but that the officer who made the arrest, and as it was his understanding . . . the Assistant District Attorney, they had a very strong case to move forward with Michael. They couldn't get him before a judge for some time.

(Cochran's Dep. at 43 (ECF No. 70-1 at 167).) Elias testified the information he relayed to Cochran came from discussions with Gammage and information he saw in the media. (Elias' Dep. Dep. at 77-78 (ECF No. 59-2 at 87-88).) Elias testified he did not tell Cochran that the prosecutor in South Bend, Indiana, decided to file charges against Haywood, the prosecutor had a strong case, or the district attorney's office had intentions to prosecute Haywood. (Elias' Dep. at 133-134 (ECF No. 70-1 at 120).) Elias testified, "Everything that Mr. Cochran got from me, if it was anything, it was what I was watching in front of TV on ESPN that I'm sure he was watching too. I knew nothing of the case." (Elias' Dep. at 145-146 (ECF No. 70-1 at 123).) Gammage testified he does not remember when he told the University that charges were being filed—it may have been before or after the Cochran and Elias telephone conversation.

(Gammage's Dep. at 50 (ECF No. 59-2 at 170).) Gammage testified he would not have told Cochran the evidence the state had against Haywood or that he saw photographs of the marks on Marriot after the incident on December 31, 2010. (Id. at 51.)

To determine whether the University was terminating the employment contract for just cause during the Cochran and Elias telephone conversation on January 1, 2011, in light of the foregoing conflicting testimony, a jury would need to resolve the disputes of fact with respect to what the University knew at the time of the telephone conversation. If a reasonable jury credits the testimony of Cochran, it could find just cause existed, even though the University did not speak with Haywood prior to terminating the employment contract, based upon the information gathered online, in media, and relayed by Elias or Gammage, i.e., the prosecutor intended to file charges against Haywood and had a strong case against him, Haywood forced himself through a barricaded door, and had a physical altercation with Marriot, which left marks on her neck. If the jury so found it could conclude the University acted in good faith when it determined it had just cause to terminate him. Under those circumstances, the University would not owe liquidated damages to Haywood because it did not breach the employment contract.

On the other hand, if the jury does not believe Cochran and credits the testimony of Elias and Gammage, it may find the University attempted to terminate Haywood based upon media reports without speaking to Haywood or knowing whether the district attorney's office intended to file charges against him. A reasonable jury based upon that evidence could find the University did not act in good faith in making the determination that it had just cause to terminate Haywood. The conduct of the University under those circumstances would be ineffective to terminate the contract. In other words, a reasonable jury could find the University breached its duty of good

faith by attempting to terminate the employment contract via the Cochran and Elias telephone conversation.

Even if a jury found the Cochran and Elias telephone conversation (1) was not effective as a just cause termination; or (2) breached the contract because the University failed to exercise good faith, the issue remains whether the press release issued by the University on January 1, 2011 at 5:42 p.m. or—at the latest—the letter the University mailed to Elias on January 4, 2011, operated as termination of the employment contract with just cause.

### 4. The Press Release Issued on January 1, 2011 at 5:42 p.m. and the Letter Mailed to Elias on January 4, 2011

#### a. Termination of the Employment Contract

If the employment contract was not terminated during the Cochran and Elias telephone conversation, a reasonable jury would have to find based upon the evidence of record that the press release issued by the University on January 1, 2011 at 5:42 p.m., three hours and thirty-two minutes after the Cochran and Elias telephone conversation, operated as termination of the employment contract. (ECF No. 59-4 at 39.) The press release provided, in pertinent part:

> After careful consideration of recent events, the University of Pittsburgh has dismissed Michael Haywood as its head football coach, effective immediately. He was advised of that action this afternoon.

(ECF No. 59-4 at 34.) This language is clear, unambiguous, and conveys an unquestionable purpose to insist on the rescission of the employment contract. Haywood does not contend that he was unaware of the press release.

Even assuming the press release did not operate as a clear termination, a reasonable jury would have to find based upon the evidence of record that the letter the University mailed to Elias on January 4, 2011, operated as termination of the employment contract. The letter provided, in part:

This letter will serve as written confirmation of the notice I provided to your agent, Albert Elias, by telephone on Saturday, January 1, 2011. Specifically, effective as of the time of that call to Mr. Elias on January 1, 2011, the University of Pittsburgh has terminated your Employment contract with the University for Cause.

(Id.) Like the January 1, 2011 press release issued by the University, this letter is clear, unambiguous, and conveys an unquestionable purpose to insist on the rescission of the employment contract. The University mailed the letter to Elias' Dallas, Texas address. (Id.) There is no dispute that Elias received the letter. (Elias' Dep. at 91 (ECF No. 70-1 at 109).) The remaining issue is whether the University acted in good faith at those times in terminating the employment contract with just cause.

### b. The University's exercise of good faith

Because the University spoke with Haywood prior to issuing the press release on January 1, 2011, and did not gather additional material information prior to January 4, 2011, the analysis with respect to whether the University acted in good faith to determine just cause existed to terminate Haywood's employment when it issued the press release and mailed the letter is the same. Based upon the evidence of record, a reasonable jury could only find that the University acted in good faith when it terminated Haywood with just cause via the press release issued on January 1, 2011, at 5:42 p.m. or—at the latest—via the letter dated January 4, 2011. The evidence of record indicates that along with what the University did and knew prior to the Cochran and Elias telephone conversation, Pederson and Cochran each spoke with Haywood prior to issuing the press release on January 1, 2011, at 5:42 p.m. Haywood explained to Pederson and Cochran his version of the events that led to his arrest on December 31, 2010. (C.S.F. ¶ 64 (ECF No. 72); Cochran Dep. at 26-27 (ECF No. 59-3 at 50-51); (ECF No. 59-4 at 18, 22); Pederson Dep. at 71-72, 78, 93 (ECF No. 59-3 at 141-142, 146, 150).)

Haywood told Cochran "that Marriott attacked him by grabbing his shoulder, he knocked her hand off him, and she slipped and fell into a wheelbarrow." (Haywood's Dep. at 216 (ECF No. 59-2 at 135).) Haywood told Cochran that he was on his way back to Pittsburgh, Pennsylvania, from South Bend, Indiana, to explain what happened on December 31, 2010 because the media reports were inaccurate. (Id.) Based upon this conversation with Haywood on January 1, 2011, Cochran determined Haywood exercised poor judgment by going into the residence, getting into an argument with Marriott, and placing himself in a situation that led to Haywood's arrest. (C.S.F. ¶ 67 (ECF No. 72); Cochran's Dep. at 34 (ECF No. 59-3 at 54).)

Pederson took notes of his conversation with Haywood. (ECF No. 59-4 at 22-23.) Haywood told Pederson his relationship with Marriot had been deteriorating. (C.S.F. ¶ 68 (ECF No. 72); Pederson Dep. at 71-72, 78, 93 (ECF No. 59-3 at 141-142, 146, 150); ECF No. 59-4 at 22; ECF No. 59-4 at 18.)  The notes indicate Haywood told Pederson the door was "barricaded" and Marriot "fell over a little kids [sic] floaty," and Haywood "caught [Marriott] as she fell over a wheel barrel." (ECF No. 59-4 at 22.) Pederson testified that Haywood's statement that he had entered the residence through a barricaded door was sufficient for Pederson to determine that Haywood's lack of judgment put Haywood in a position that made it impossible for Haywood to continue as the University's head football coach. (C.S.F. ¶ 70 (ECF No. 72); Pederson Dep. at 82 (ECF No. 59-3 at 148).)

On January 1, 2011, Pederson and Cochran informed Nordenberg about their conversations with Haywood. (Nordenberg's Dep. at 18 (ECF No. 59-2 at 55) Nordenberg testified this is the time when the University made the final decision to terminate Haywood. Nordenberg, who at that time knew about Haywood's arrest and that charges were filed against him, concluded Haywood engaged in conduct which provided the University just cause to

terminate him, including bringing the University into disrepute and engaging in conduct which was "seriously prejudicial to the best interest of the University or its inter-collegiate sports athletic program." (C.S.F. ¶ 78 (ECF No. 72); Nordenberg's Dep. at 7, 27-28, 71-73 (ECF No. 59-2 at 52, 59-60, 73-75); Cochran's Dep. at 51-52 (ECF No. 59-3 at 60-61).)

In light of what the University did and knew at the time it issued the press release on January 1, 2011 at 5:42 p.m. and sent the letter to Elias on January 4, 2011, a reasonable jury could only find—based upon Haywood's own statements to Cochran and Pederson about what he did—that at those times the University had just cause to terminate Haywood's employment and exercised good faith in making that determination. Haywood, under those circumstances, would not be entitled to damages as a matter of law.

### 5. Resultant Damages

Based upon the foregoing discussion, a reasonable jury could only find the University breached the employment contract if it found the University attempted to terminate the employment contract via the Cochran and Elias telephone conversation without exercising good faith. If a jury finds in favor of the University on that issue, then there was no breach of contract. Even if a jury made a finding that the University breached the employment contract, however, Haywood would not be entitled to damages. Paragraph 14.1 of the employment contract expressly provided that upon just cause termination "the University shall be relieved of all further obligations (financial and otherwise) to Employee." (Employment Contract ¶ 14.1 (ECF No. 14-1).) This language clearly and unambiguously provides that all obligations the University owed to Haywood cease upon termination of the employment contract with just cause. Once the University exercised good faith and determined it had just cause to terminate the employment contract, i.e., at the latest when it issued the January 1, 2011 press release or sent the January 4,

2011 letter to Elias, <u>all</u> obligations it owed to Haywood, including the obligation to pay Haywood liquidated, nominal, or any other kind of damages, ceased. Under the terms of the employment contract, the University cannot be held liable to Haywood as a matter of law because it terminated him with just cause and in good faith at the latest on January 1, 2011 via the press release issued at 5:42 p.m. or by sending Elias the letter dated January 4, 2011. The University's motion for summary judgment must, therefore, be granted with respect to count A because Haywood cannot establish the third element of a claim for breach of contract—resultant damages.

### B. Count B—Breach of Oral Agreement

Haywood alleges he entered into a separate oral contract ("oral contract") with the University whereby the University agreed to buy out the remaining term of his coaching contract with Miami University. (Complaint (ECF No. 1).) Haywood alleges the University breached its duty under this oral contract by refusing to buy out the remaining term of the Miami University contract. (<u>Id.</u>) Haywood alleges the University's breach of this duty proximately caused Haywood to suffer monetary damages in the amount of $300,000, which Miami University is now demanding Haywood personally pay. (<u>Id.</u>)

In its motion for summary judgment, the University argues Haywood cannot establish a breach of the alleged oral contract because: (1) the employment contract was integrated and the parol evidence rule bars this alleged prior oral agreement; and (2) the employment contract expressly barred extra-contractual obligations when termination occurred. (ECF No. 57.)

As discussed <u>supra</u>, a plaintiff suing for breach of contract under Pennsylvania law must demonstrate (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. <u>Ware</u>, 322 F.3d at 225. The University

argues the first element, i.e., the existence of a contract, cannot be proven in this case with respect to the Miami University buyout because evidence with respect to the parties' prior oral agreement to buyout the remaining term of Haywood's contract with Miami University is barred by the parol evidence rule.

The court will address the applicability of the parol evidence rule to this claim and each of the elements of a claim for breach of contract to determine whether summary judgment is appropriate with respect to this claim.

### 1. The Existence of a Contract – Parole Evidence Rule

The Pennsylvania Supreme Court has explained the parol evidence rule as follows:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004) (quoting Gianni v. Russell & Co., 126 A. 791, 792 (Pa. 1924)). For the parole evidence rule to apply, there must be a writing that represents the "entire contract between the parties." (Id.)

The court must determine, as a matter of law, whether the writing at issue, i.e., the employment contract, is an integrated agreement. McGuire v. Schneider, Inc., 534 A.2d 115, 118 (Pa. Super. Ct. 1987). A written contract is "integrated" if it represents a final and complete expression of the parties' agreement. Kehr Packages Inc. v. Fidelity Bank, Nat. Ass'n, 710 A.2d 1169, 1173 (Pa. Super. Ct. 1998) (citing Lenzi v. Hahnemann Univ, 664 A.2d 1375, 1379 (Pa. Super. Ct. 1995)). To determine whether a writing is the parties' complete expression of their agreement, the writing must be examined and "if it appears to be a contract complete within

itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties." Gianni, 126 A. at 792.

"An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." Yocca, 854 A.2d at 436 (Pa. 2004). The effect of an integration clause is to make the parol evidence rule particularly applicable. Hart v. Arnold, 884 A.2d 316, 341 (Pa. Super Ct. 2005). Here, there is no dispute that the employment contract contained an integration clause. Paragraph 24.1 of the employment contract provided:

> This Contract constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all previous and contemporaneous negotiations, commitments and understandings, whether verbal or written.

(employment contract ¶ 24.1 (ECF No. 14-1); C.S.F ¶ 28 (ECF No. 72).) The existence of this clause in the employment contract indicates the employment contract represents the parties' entire agreement with respect to Haywood's employment with the University. Absent an exception, the parol evidence rule would, therefore, bar the admission of evidence with respect to negotiations, conversations, and agreements to explain or vary the terms of the employment contract made prior to its execution. (Id.)

There is an "admission exception" to the parol evidence rule when the party seeking to enforce the agreement as written has made admissions that the agreement does not, in fact, constitute the entire agreement between the parties even when it contains an integration clause. Giant Food Stores, Inc. v. Marketplace Commc'n Corp., 717 F. Supp. 1071, 1074 (M.D. Pa. 1989) (citing Coal Operators Cas. Co. v. Charles T. Easterby and Co., Inc., 269 A.2d 671, 672

(Pa. 1970)). The Pennsylvania Supreme Court has recognized this exception to the parol evidence rule:

> [P]arol evidence is admissible to explain and supplement a written agreement where such evidence clearly shows that the writing in question was not intended to and did not properly state the entire agreement between the parties. In re Boyd's Estate, 146 A.2d 816 (Pa. 1958). The parol evidence rule has never barred the introduction of clear, precise, and convincing evidence to show that the party who seeks to enforce the written agreement according to its tenor has admitted and acknowledged that the agreement as written did not express what the parties intended and that what the parties intended was omitted from the agreement by mistake or accident.

Scott v. Bryn Mawr Arms, Inc., 312 A.2d 592, 595 (Pa. 1973) (citing In re Boyd's Estate, 146 A.2d at 820). In Yuhas v. Schmidt, the court further explained:

> "Where a party***seeking to have a written agreement enforced according to its terms, [a]dmits in his own trial testimony that the agreement in writing did not Full and Completely state the entire agreement between the parties, then parol evidence is admissible to explain and supplement such written agreement."

Yuhas v. Schmidt, 258 A.2d 616, 621 (Pa. 1969) (quoting Slavinski Estate, 218 A.2d 125, 128 (Pa. 1966)).

The parol evidence rule bars the admission of material contrary to the express terms of the written agreement "unless it is that the whole of the agreement is not set forth in the writing." Domino's Pizza LLC v. Deak, 383 F. App'x. 155, 159 (3d. Cir. 2010) (quoting Scott, 312 A.2d at 595). "The burden is on the proponent of the parol evidence to establish such an admission of incompleteness in the writing by clear, precise, and convincing evidence." Domino's Pizza LLC, 383 F. App'x at 159 (citing Scott, 312 A.2d at 595). The burden is of both law and fact. Domino's Pizza LLC, 383 F. App'x at 159 (citing Coal Operators Cas. Co., 269 A.2d at 674). "The admission of incompleteness must have been made, or alleged to have been made, at a time subsequent to entering into the written agreement." Domino's Pizza LLC, 383 F. App'x at 159 (citing Scott, 312 A.2d at 596).

It is undisputed in this case that the University promised to buyout Haywood's remaining contract with Miami University. Pederson testified that the University orally promised to buyout Haywood's employment contract with Miami University, but that it did not happen because Haywood's employment "was terminated before we ever got to that point." (Pederson's Dep. at 20 (ECF No. 70-1 at 20).) Elias testified he spoke with Cochran regarding a buyout clause, and Haywood would not sign the employment contract unless a buyout clause was included in the contract. (Elias' Dep. at 45-47 (ECF No. 70-1 at 98).) Elias testified that Cochran told him "he was not going to put it in there but he assured [Elias] that it would get paid out, that [Elias] could trust him on his word." (Elias' Dep. at 47 (ECF No. 70-1 at 98).) Elias also testified it would be consistent with common practice for the University to buyout Haywood's existing contract with Miami University, and if a university agreed to such a condition, the employment contract would contain a provision explaining the terms of the buyout agreement. (Elias' Dep. at 45 (ECF No. 70-1 at 98).)

Based upon the foregoing, the admission exception applies in this case because Haywood presented clear, precise, and convincing evidence, i.e., Pederson's testimony, that the parties' written agreement was not the parties' entire agreement. See Int'l Milling Co. v. Hachmeister, Inc., 110 A.2d 186, 191 (Pa. 1955) ("The presence of an integration clause cannot invest a writing with any greater sanctity that the writing merits where, as here, it assertedly does not fully express the essential elements of the parties' undertakings."). Under those circumstances, the parol evidence rule does not bar the admission of evidence with respect to the parties' oral agreement that the University would buyout Haywood's contract with Miami University.[4] A

---

[4] Some courts speak of an additional requirement that fraud, accident or mistake be proven before the admission exception can be applied; however, Pennsylvania courts have applied the admission exception when the omission was deliberate. Giant Food Stores, Inc. v. Marketplace

reasonable jury could only find that the parties had an oral agreement apart from the employment contract pursuant to which the University would buyout Haywood's contract with Miami University. Haywood has, therefore, established the first element of his prima facie case, i.e., the existence of a contract.

### 2. Breach of a Duty Imposed by the Contract

It is undisputed that the University did not buyout Haywood's remaining contract with Miami University. Pederson testified that not only did the University promise to buyout Haywood's remaining contract with Miami University, but also that it did not happen because Haywood's employment "was terminated before we ever got to that point." (Pederson's Dep. at 20 (ECF No. 70-1 at).) After Haywood's termination, the University "refused responsibility to buy [the Miami University contract] out." (Elias Dep. at 56 (ECF No. 70-1 at 100).) Under those circumstances, because there is no genuine dispute of material fact with respect to whether the University bought out Haywood's remaining contract with Miami University, Haywood could satisfy the second element of his prima facie case, i.e. a breach of a duty imposed by the oral agreement.

### 3. Resultant Damages

"To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'" <u>Ware</u>, 322 F.3d at 225-226 (quoting <u>ATACS Corp. v. Trans World Commc'n, Inc.</u>, 155 F.3d 659, 668 (3d Cir.)). "At a minimum, reasonable certainty

---

Comm'ns Corp., 717 F. Supp. 1071, 1076 (1989). <u>See</u> also <u>Yuhas v. Shmidt</u>, 258 A.2d 616, 621 (Pa. 1969); <u>Yezbak v. Croce</u>, 88 A.2d 80, 81 (Pa. 1952); <u>In re Boyd's Estate</u>, supra; <u>Ward v. Zeigler</u>, 132 A. 798, 799 (Pa. 1926); <u>Pacific Indemnity Co. v. McDermott Bros. Co.</u>, 336 F. Supp. 963, 970 (M.D. Pa. 1971) (admission by an officer of the corporation seeking to enforce the written agreement that the agreement did not constitute the entire agreement between the parties is sufficient in itself to permit parol evidence) (citing <u>Yuhas</u>, supra), <u>aff'd</u>, 475 F.2d 1395 (3d Cir. 1973) (table).

embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." Ware, 322 F.3d at 226 (quoting ATACS Corp.,155 F.3d at 669).

There is no genuine dispute of fact that Haywood would have suffered damages if the University breached the oral agreement. In February 2011, Miami University sent Haywood a letter demanding he personally pay the $300,000 buyout. (Elias' Dep. at 56 (ECF No. 70-1 at 100); Haywood's Dep. at 247-248 (ECF No. 70-1 at 65).) Haywood has not been in contact with Miami University regarding the buyout clause since February 2011, but testified that Miami University discussed the buyout with Elias in 2012. (Id.) Under those circumstances, there is no genuine dispute of material fact with respect to the third element of a claim for breach of contract, i.e., resultant damages.

### 4. Effect of a Just Cause Termination of the Employment Contract on the Oral Contract

The University argues that even if the parol evidence rule does not bar its promise to buyout Haywood's remaining contract with Miami University, the terms of the employment contract expressly barred extra-contractual obligations when termination of the employment contract occurred. (ECF No. 57 ¶ 2.) Having determined the parol evidence rule does not bar evidence of the existence of the oral agreement to buyout Miami University, the court must consider whether the obligations of the University under the oral agreement or resulting from a breach of that agreement survived termination of the employment contract. This issue presents a matter of contract interpretation.

"If contracting parties choose, they may express their agreement in one or more writings and, in such circumstances, the several documents are to be interpreted together, each one contributing (to the extent of its worth) to the ascertainment of intent of the parties." Int'l Milling Co., 110 A.2d at 191 (citing Hous. Mortg. Corp. v. Allied Constr, Inc., 97 A2d 802, 805 (Pa.

1953). "It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties." Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 107 (3d Cir. 1986) (citations omitted). "The presence of an integration clause in separate agreements is not a bar to the agreements being construed together as long as the agreements are part of the same business transaction." Patel v. Patel, Civ. No. 06-1846, 2007 WL 2907944, at *6 (M.D. Pa. Sept. 28, 2007) (quoting Kroblin Refrigerated, 805 F.2d at 107-109). Where two agreements are made as part of one transaction they will be read together to express the essential elements of the parties' undertaking, notwithstanding the presence of an integration clause in the second agreement. Patel, Civ. No. 06-1846, 2007 WL 2907944, *6 (citing Neville v. Scott, 127 A.2d 755, 757 (Pa. Super. Ct. 1956)).

Here, the court must consider the parties' intent with respect to the University's oral agreement to buyout Miami University. The record contains evidence that the University did not intend the oral agreement to buyout Miami University to be a part of the employment contract. Cochran told Elias that the University would buyout Haywood's remaining contract with Miami University, but that he would not put it in the employment contract. (Elias' Dep. at 47 (ECF No. 70-1 at 98).) Viewing the evidence in the light most favorable to the nonmoving party, the buyout provision was not included in the employment contract. The oral agreement under those circumstances arguably would not be considered part of the employment contract; rather, it would be a separate agreement, apart from the employment contract. If the oral agreement is not considered part of the employment contract, the court must determine whether the parties'

separate agreement to buyout Haywood's contract with Miami University survives just cause termination of the employment contract.

The employment contract provided:

> Notwithstanding any other provisions hereof, the University may at any time, with just cause, terminate this Contract or suspend the Employee with or without pay. In the event of such termination, **the University shall be relieved of all further obligations (financial and otherwise) to Employee**.

(Employment Contract ¶ 14.1 (ECF No. 14-1) (emphasis added)). The court must consider whether under this provision the University was relieved from its obligation to buyout Haywood's contract with Miami University if it terminated Haywood with just cause. The issue depends upon whether "all further obligations" means only obligations under the employment contract or *any* obligations existing between the parties, including agreements separate from the employment contract. This issue is a matter of contract interpretation.

"The paramount goal of contract interpretation is to determine the intent of the parties." Baldwin v. Univ. of Pgh. Med. Ctr., 636 F.3d 69, 75 (3d Cir. 2011) (quoting Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 587 (3d Cir. 2009). "Courts are to consider 'not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.'" Baldwin, 636 F.3d at 75 (quoting Am. Eagle Outfitters, 584 F.3d at 582); see Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980) ("[C]ourts must eschew the ideal of ascertaining the parties' subjective intent and instead bind parties by the objective manifestations of their intent."). The strongest objective manifestation of intent is the language of the contract. Baldwin, 636 F.3d at 75 (citing Mellon Bank, 619 F.2d at 1009).

"Courts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous. Baldwin, 636 F.3d at 76 (citing Mellon Bank, 619 F.2d at 1011). "If the

words of the contract are capable of more than one objectively reasonable interpretation, the words are ambiguous. Baldwin, 636 F.3d at 76 (citing Am. Eagle Outfitters, 584 F.3d at 587). But, where "the language is clear and unambiguous, the express terms of the contract will control." Atkinson v. LaFayette Coll., 460 F.3d 447, 452 (3d Cir. 2006). "The court can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation." Id.

Here, the employment contract expressly provided that upon just cause termination "the University shall be relieved of all further obligations (financial and otherwise) to Employee." (Employment Contract ¶ 14.1 (ECF No. 14-1).) The use of the language, "all further obligations" is not limiting, but all encompassing. In construing a writing, "it is basic that it must be read as a whole and every portion thereof considered in determining its intent and true purpose." In re Alloy Mfg. Co. Emp. Trust, 192 A.2d 394, 396 (Pa. 1963) (internal citations omitted). "Stated another way, the intention of parties to a written instrument is to be garnered from a reading of the entire writing and not from detached portions, it being necessary to consider every part thereof in order to resolve the meaning of a particular part as well as that of the whole." In re Alloy Mfg. Co. Emp. Trust, 192 A.2d at 396 (citing Mowry v. McWherter, 74 A.2d 154, 158 (Pa. 1950)).

Reading the employment contract as a whole, it is clear words of limitation are used in some paragraphs and not in others. For example, paragraphs 14.4 and 14.10, contain the word "hereunder" to refer to obligations existing only under the employment contract. There is no limiting language in paragraph 14.1. The court in determining the intent and true purpose of the employment contract, must consider the use of limiting language in some of the provisions and not in others. If the parties intended to limit "all further obligations" to those existing only under

the employment contract, they could have done so. Paragraph 14.1 does not contain any words of limitation. Paragraph 14.1, therefore, can only be read to indicate the parties' intent that "all further obligations" applies to obligations both under and apart from the employment contract. The only objectively reasonable interpretation of paragraph 14.1 is that upon just cause termination of the employment contract, all obligations the University had, including and apart from the employment contract, cease. Haywood, furthermore, failed to offer any argument or evidence contradicting the clear and unambiguous meaning of this provision.

As discussed <u>supra</u>, a reasonable jury could only find that the employment contract was terminated with just cause and in good faith at the latest via the January 1, 2011 press release or the January 4, 2011 letter to Elias. At the time of the just cause termination all obligations of the University to Haywood ceased. The oral agreement to buyout Haywood's remaining contract with Miami University or obligations arising from its breach did not, therefore, survive the just cause termination of the employment contract, i.e., after the just cause termination, the University had no obligation to buyout the Miami University contract, and there can be no resultant damage from breach of the oral agreement, whether actual or nominal. The University's motion for summary judgment with respect to count B will, therefore, be granted.

### C. The University's Counterclaim—Breach of Confidentiality

The University in its counterclaim alleges Haywood breached the confidentiality provision of the employment contract when he, through his agents and attorneys, disclosed financial terms of the employment contract. (ECF No. 58 at 19-20.) The University and Haywood filed cross-motions for summary judgment with respect to this claim. (ECF Nos. 57, 60.) The University moves for summary judgment claiming it is undisputed that Haywood and his agent breached the employment contract's confidentiality provision by publicizing the

employment contract's financial terms. (ECF No. 58 at 19-20.) The University is seeking nominal damages. (Id.) Haywood moves for summary judgment arguing the University did not identify any damages caused by his alleged breached of the employment contract. (ECF No. 61 ¶ 7.)

As discussed supra, a plaintiff asserting a claim for breach of contract under Pennsylvania law must demonstrate (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. Ware, 322 F.3d at 225. Here, there is no genuine dispute of fact that an agreement existed. The confidentiality provision of the employment contract provided:

> The Employee and the University shall keep this Contract confidential, and shall not use any information contained herein for any purpose other than the purposes contemplated under this Contract. Each party acknowledges the importance of maintaining the security and confidentiality of this Contract and agrees to take whatever measures are necessary to prevent the unauthorized or inadvertent transfer, disclosure, access or use of the information contained herein to or by any third party. Each party hereto agrees to ensure that the terms and conditions of this Contract are adhered to by all persons who have access to the information contained herein through such party, including employees, advisors, representatives, and agents, and shall be responsible for breaches of confidentiality by its/his own employees, advisors, representatives, agents, and other persons who gain access to any such information through such recipient party. The information contained herein shall be disclosed only to those persons who are actively and directly participating in the performance of this Contract and who need to know such information, and each party shall use best efforts to inform the receiving party of the sensitive nature of such information and shall direct the receiving party to keep such information confidential.

(Employment Contract ¶ 17.1 (ECF No. 14-1); C.S.F. ¶ 26 (ECF No. 72)). It is also undisputed that Haywood's confidentiality obligations survived termination of the employment contract. (Employment Contract ¶ 17.1 (ECF No. 14-1); C.S.F. ¶ 27 (ECF No. 72)).

**1. The University's Cross-Motion—Breach of a Duty Imposed by the Contract**

The University argues in its motion for summary judgment: "[I]t is undisputed that Mr. Haywood and/or his agents breached the [Employment] Contract's confidentiality obligations by publicizing the Contract's financial terms." (ECF No. 58.) The University claims Haywood breached the confidentiality provision by authorizing the release of a June 2011 press release issued by the Buzzbee Law Firm, which represented Haywood.

The June 2011 press release provided, in pertinent part:

> Michael Haywood, former head coach of the University of Pittsburgh football team, has asked the Pennsylvania Human Relations Commission and other state and federal agencies to investigate the university's firing of him, The Buzbee Law Firm announced today.
>
> In a corresponding notice letter sent to the university, Haywood attorney Tony Buzbee raises concerns about Pitt's lack of investigation and the coach's termination sixteen days after he was hired.
>
> Buzbee said, "In their rush to judgment, Pitt officials did not bother to contact the alleged victim or even the coach himself. I believe the university violated its contract with the coach, the university's employment procedures, and the Due Process Clause of the U.S. Constitution. Had Pitt conducted even a cursory investigation, it would have determined that the alleged incident simply did not occur as reported, and the termination would not have occurred. We are exploring other motives for Pitt's firing of Coach Haywood."
>
> Haywood's five-year contract with Pitt would have paid him up to $7.5 million, plus other incentives.

(Press Release (ECF No. 59-3 at 2)).

In its brief in support of its motion for summary judgment, the University did not identify what "financial" information contained in the press release violated the confidentiality provision of the employment contract. The only information in the press release with respect to financial information is "Haywood's five-year contract with Pitt would have paid him up to $7.5 million,

plus other incentives." (Id.) The court will, therefore, consider whether disclosure of this information constituted a breach of the confidentiality provision of the employment contract.

First, the court must consider whether the information disclosed in the press release constitutes confidential information. It is clear in Pennsylvania that information available publicly is not confidential information. Bell Fuel Corp., 544 A.2d at 461 (citing Carl A. Colteryahn Dairy, 203 A.2d 469, 472-73 (affording no protection to delivery route listings that were not a particular secret, easily discoverable and common knowledge)). See e.g., Spring Steels, Inc. v. Molloy, 162 A.2d 370, 375 (Pa. 1960) (customer lists that are publicly available are not particular secrets of the employer entitled to protection); Vincent Howitz Co. v. Cooper, 41 A.2d 870, 871 (Pa. 1945); Agra Enter., Inc. v. Brunozzi, 448 A.2d 579, 582 (Pa. Super. Ct. 1982); see also Wound Care Ctr., Inc. v. Catalane, Civ. No. 10-336, 2011 WL 553875, at *16 (W.D. Pa. Feb. 8, 2011).

Haywood did not address whether the press release contained confidential information in his response to the University's motion for summary judgment. The court, however, cannot grant summary judgment in favor of the University solely because Haywood failed to respond to its motion for summary judgment with respect to that issue. The University is entitled to judgment as a matter of law only if the evidence of record supports such a finding. Anchorage Assocs. V. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990) ("Even though Rule 56(e) requires a non-moving party to 'set forth specific facts showing that there is a genuine issue for trial', it is 'well-settled ... that this does not mean that a moving party is automatically entitled to summary judgment if the opposing party does not respond.'").

Although Haywood did not raise the issue in his brief in opposition to the University's motion for summary judgment, in the combined statement of material facts, he asserts the

information disclosed in the press release is not confidential.[5] Haywood did not cite to the record in support of this assertion, but the record contains evidence that the financial terms discussed in the press release, "up to $7.5 million, plus other incentives," were publicly available. In his deposition, Elias testified, "USA Today has every salary of every coach known to man. You could get that." (Elias' Dep. at 110 (ECF No. 59-2 at 90).) Elias testified "the whole world knows" the financial terms stated in the press release. (Id.) The University did not present any evidence to contradict Elias' testimony that the information disclosed via the press release was publicly available. Accordingly, based upon Elias' testimony, a reasonable jury could find the financial terms contained in the press release were publicly available.

Having determined that based upon the record presented a reasonable jury could find the financial terms disclosed were publically available, the court must consider whether Haywood breached the confidentiality provision of the employment contract by disclosing information that is publically available. Restrictive covenants, including confidentiality agreements, are not favored in Pennsylvania, but have long been held to be enforceable if: (1) they are incident to an employment relationship between the parties; (2) the restrictions imposed by the covenant are reasonably necessary for the protection of legitimate interests of the employer; and (3) the

---

[5] The parties' Combined Statement of Facts provides:

> Fact 84: In June 2011, Mr. Haywood and his attorney/agent approved a press release disclosing the confidential financial terms of his [employment] Contract, which they knew would be sent to numerous media outlets.

> Response 84: Denied, to the extent the terms released were confidential.

> Fact 85: The press release resulted in national press coverage of confidential Contractual terms.

> Response 85: Denied, to the extent the terms released were confidential.

(C.S.F. ¶¶ 84, 85 (ECF No. 72)).

restrictions imposed are reasonably limited in duration and geographic extent. Hess v. Gebhard & Co. Inc, 808 A.2d 912, 917 (Pa. 2002).

With respect to confidentiality agreements, the court needs only to consider the second element, i.e., whether the restrictive covenants are reasonably necessary for the protection of legitimate interests of the employer. See Henry Hope X-Ray Prod., Inc., 674 F.2d 1336, 1342 (9th Cir. 1982) (applying Pennsylvania law) ("[A] confidentiality agreement's restrictions may not be greater than is required for the protection of the person for whose benefit the restraint is imposed' and impose undue hardship upon the person restricted.")  In Hess, the Pennsylvania Supreme Court held: "If the information the employer seeks to keep confidential could be obtained by legitimate means by its competitors, enforcement of the covenant on that basis is not appropriate. Hess, 808 A.2d at 924 (citing Carl A. Colteryahn Dairy v. Schneider Dairy, 203 A.2d 469, 473 (Pa. 1964) (commenting that "equity will not protect mere names and addresses easily ascertainable by observation or reference to directories.")).

While the restrictions imposed by the confidentiality provision of the employment contract may be reasonable to protect the University's confidential information, the restrictions are not reasonable as applied to information that is publicly available. Based upon Elias' undisputed testimony that the financial terms contained in the press release were available on USA Today, the restrictions would not be reasonably necessary to protect the University's legitimate interests. In other words, the University would have no legitimate interest in protecting information that is publicly available.

Based upon the evidence of record, there is sufficient evidence for a reasonable jury to find Haywood did not breach the confidentiality provision of the employment contract when he released information publicly available via the press release. The University did not point to

evidence sufficient to prove the second element of its prima facie case, i.e., breach of the confidentiality provision of the Employment contract. The University's motion for summary judgment will, therefore, be denied with respect to its counterclaim.

## 2. Haywood's Cross-Motion—Resultant Damages

With respect to the third element in a breach of contract claim, Haywood argues his motion for summary judgment should be granted because the University "cannot show with any reasonable certainty that it has suffered any damages as a result of Mr. Haywood's alleged breach of his Employment contract with [the University]." (ECF No. 60-1). The University argues Haywood's argument is moot because the University only seeks nominal damages. (ECF No. 65.)

Under Pennsylvania law, if a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages. Thorsen v. Iron and Glass Bank, 476 A.2d 928, 931 (Pa. Super. Ct. 1984). See also Scobell Inc. v. Schade, 688 A.2d 715, 719 (Pa. Super. Ct. 1997) ("any breach of contract entitles the injured party at least to nominal damages"); Zeno v. Ford Motor Co., Inc., 480 F. Supp. 2d 825, 834 (W.D. Pa. 2007) ("In light of the law of Pennsylvania allowing nominal damages for a breach of contract, summary judgment cannot be granted for failure to show damages.").

In Stevenson v. Economy Bank of Ambridge, 197 A.2d 721, 728 (Pa. 1964), the Pennsylvania Supreme Court held that because "the basic unit of American money is the dollar . . . in the future, when nominal damages are awarded in our courts, one dollar ($1) shall be the measure thereof. The Third Circuit Court of Appeals applying Pennsylvania law has followed this rule. Nicholas v Pennsylvania State University, 227 F.3d 133, 146 (3d Cir. 2000) (citing United States ex rel. Tyrrell v. Speaker, 535 F.2d 823, 830 (3d Cir. 1976)). Haywood's motion

for summary judgment must, therefore, be denied because the University, if it proves the other elements of a claim for breach of contract, may be entitled to nominal damages.

Based upon the foregoing, the University's motion for summary judgment with respect to breach of confidentiality on its counterclaim will be denied. Because of Elias' undisputed testimony that the financial terms in the press release are publicly available, a reasonable jury could find that Haywood did not breach the confidentiality provision of the Employment contract.

The situation is different with respect to the element of breach of the confidentiality provision in Haywood's motion for summary judgment. The issue of confidentiality was not raised in Haywood's cross-motion. Haywood did not argue he is entitled to summary judgment on the University's counterclaim because the information disclosed in the press release was confidential. Haywood argued only the third element, i.e., he is entitled to summary judgment on the counterclaim because the University cannot prove damages. The University, therefore, did not have notice or an opportunity to respond to the argument that a reasonable jury could not find Haywood breached the confidentiality provision in the employment contract. The court will not grant summary judgment to Haywood on that issue sua sponte when he did not raise it in his motion. See 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2719 (3d ed. 1998) (noting it some courts have held it is reversible error to enter summary judgment without "providing the parties a reasonable opportunity to present opposing material.") (citing, inter alia, Crown Cent. Petoleum Corp. v. Waldman, 634 F.2d 127, 129 (3d Cir. 1980); Twin City Fed. Sav. And Loan Ass'n v. Trasnamerica Ins. Co., 491 F.2d 1122, 1126 (8th Cir. 1974) ("Although a district court may assist through pretrial proceedings in sharpening the issues, a court may not pose the issue and then proceed to decide

the same without a motion for summary judgment."). Haywood may seek leave to file a motion for summary judgment with respect to this issue within thirty days of the entry of the order with respect to the pending motions for summary judgment. Under those circumstances, Haywood's motion for summary judgment with respect to the University's counterclaim for breach of confidentiality must be denied because if the University proves Haywood breached the confidentiality provision, it would be entitled to nominal damages.

## VI.    *Conclusion*

For the reasons set forth in this memorandum opinion, the University's motion for summary judgment (ECF No. 57) is GRANTED IN PART with respect to counts A and B of the complaint and DENIED with respect to the counterclaim. Haywood's motion for summary judgment (ECF No. 60) on the University's counterclaim is DENIED. An appropriate order will be entered.


Dated: September 30, 2013                    By the court,

                                             /s/ Joy Flowers Conti
                                             Joy Flowers Conti
                                             Chief United States District Judge